Peyton, Respondent, vs. Minong Lumber & Lath Com-
pany and others, Appellants.

*February 21—April 3, 1912.*

*Corporations: Insufficient stock subscription: Management: De facto
officers: Mortgages: Validity: Consent of all parties: Chattel
mortgages: Filing: Actual possession: Logs and lumber.*'

1. Although a corporation never became legally authorized to elect
   officers or to transact business with any others than its mem-
   bers, transfers of the corporate property to a stockholder as
   security for the repayment of moneys advanced by him to *de
   facto* officers for corporate uses are *held* to be valid transfers,
   the *de facto* officers who made them in the name of the cor-
   poration having been carrying on its business in an informal
   way with the knowledge and consent of all the other stock-
   holders, and no rights being involved other than those of per-
   sons who had consented, either expressly or impliedly, to
   everything that was done.

2. Sawmill property of a lumber company was leased to one C.,
   who agreed to manufacture into lumber a quantity of logs be-
   longing to the company under the supervision and control of
   one P., who was to pay the expenses of manufacture. The logs
   were conveyed to P. as security for the company's indebted-
   ness to him, and he was authorized to sell the lumber and,
   after paying the expense of manufacture and the indebted-
   ness to him, to return any surplus to the company. *Held*, that
   delivery of the logs to C. under the agreement was a delivery
   to P., and C.'s possession during the process of manufacture
   was actual possession by P., so that the agreement, though
   never filed, was a valid chattel mortgage as against a subse-
   quent execution levy.

Appeal from a judgment of the circuit court for Douglas
county: James Wickham, Judge. *Affirmed.*

This is an action to reform and foreclose a bill of sale exe-
cuted in lieu of a chattel mortgage and covering a quantity
of logs, also to foreclose a chattel mortgage upon a leasehold
interest in lands and the buildings thereof, and to enjoin the
defendants *Spafford* and *Sullivan* from selling said property

upon execution.    The action was tried by the court.    It appeared by the evidence that the *Minong Lumber & Lath Company,* which is alleged to have executed the securities in question, is a domestic corporation organized by the execution and filing of articles of incorporation in October, 1906, with a nominal capital stock of $10,000, divided into shares of $1 each, the incorporators being John V. Gilbert, Laura Gilbert, his wife, and one Newton.    There were no written subscriptions to the stock.    Twenty-six hundred shares were issued to John V. Gilbert, 360 to Laura Gilbert, 1,500 to the defendant *Spafford,* and 100 to the plaintiff, *Peyton.*    One share was sent to an attorney for Mr. Newton, but there is nothing to show that it ever reached him.    Newton simply signed the articles in order to satisfy the requirement of the statute for three corporators and does not appear further in the case.    Laura Gilbert owned a sawmill site near the village of Minong, Washburn county, and prior to the organization of the corporation John V. Gilbert had done considerable work and furnished material in getting flowage, preparing tail races, bringing down timber, etc., preparatory to the building of a mill and dam, and he turned this work and improvements over to the corporation in part payment for his stock.    *Spafford* kept a store at the village of Minong, and he paid in $200 in cash on his stock.    *Peyton* had a bank at Proctor, Minnesota, at which the corporation did its banking business, and paid $100 for his stock by crediting up $100 to the account of the corporation.    Soon after the articles of incorporation had been filed Gilbert solicited *Spafford* to become a stockholder, and after some solicitation he consented, it being understood that he was to receive $1,500 worth of stock for $1,000.    There were probably no meetings of the stockholders or directors in a formal sense ever held.    Gilbert claims that he and *Spafford* and Mrs. Gilbert met at *Spafford's* store, and that it was agreed that he (Gilbert) should be president of the corporation, Mrs. Gilbert

secretary, and *Spafford* treasurer, and that the three should constitute the board of directors. *Spafford* denies that any such meeting was held, but admits that he agreed to take $1,500 worth of stock for $1,000, and talked matters over with Gilbert and understood that Gilbert was to be president and he himself treasurer, and that Mrs. Gilbert was to be secretary for the time being. Whether any meetings ever took place or not, it is clear that a general understanding was reached between the three persons named that the business was to be prosecuted by Gilbert and *Spafford* as the active members of the concern. In pursuance of this general understanding, the work of building a small sawmill on the mill site leased from Mrs. Gilbert was actively pushed in the late fall and winter of 1906, Mr. Gilbert being in charge of the building operations. An understanding was reached with Mrs. Gilbert by which she agreed to lease the site for three years at $120 per year, and a lease was drawn to that effect, but never executed by her. However, possession was taken and corporate stock was issued to and received by her for $360 in payment of the three years' rent. *Spafford* claims that he knew nothing about the issuance of this stock, and that it was issued by Gilbert without his knowledge or consent. In December, 1906, Gilbert purchased logs and lath bolts for the mill, and issued orders in payment directed to the corporation by name, which were cashed by *Spafford* and sent by him to *Peyton,* who returned the cash thereon to *Spafford* and charged the amounts to the corporation on his books. *Spafford* paid for the sawmill machinery. *Spafford* bought the first boiler and engine. January 9, 1907, Gilbert and wife gave plaintiff a mortgage on two lots owned by them in Proctor Knott, Minnesota, for $2,000, as security for advances made and to be made. Prior to March 5, 1907, *Mr. Peyton* had advanced about $2,000 by way of cashing orders for logs. On that date J. V. Gilbert and wife, claiming to act as president and secretary of the corporation, gave

to plaintiff a bill of sale of 200,000 feet of jack pine timber as security for the existing indebtedness. This is the first instrument involved in this action. It is admitted that by mistake it described the timber as on the N. E. $\frac{1}{4}$ of the N. E. $\frac{1}{4}$ of section 22, when in fact it was on the N. W. $\frac{1}{4}$ of the N. W. $\frac{1}{4}$ of said section, and this is the respect in which reformation is asked in this action. Mr. and Mrs. Gilbert testified that this bill of sale was given after a conference with *Spafford* and with his consent, but this was denied by *Spafford*. Subsequently other logs were purchased and paid for by orders cashed by *Spafford* and *Peyton* and mixed with the logs covered by the bill of sale. To the knowledge of *Peyton* and with his acquiescence, the bill of sale was duly filed in the proper office March 12, 1907. In May, 1907, sawing of logs and lath bolts began under the active management of Gilbert, and sales began to be made. Some 80,000 feet were sold, and half of it sold and shipped out and the money received by *Spafford*. There was an accident to the boiler in June which delayed sawing for a time, and another boiler was installed in August and sawing was continued until the pond froze up. *Spafford* actively assisted in the sale of the product, advanced money to carry on the business, and went to the mill weekly to see how matters were progressing. December 10, 1907, Gilbert and wife, acting as president and secretary of the corporation, executed on behalf of the corporation a mortgage covering the leasehold interest of the corporation in the sawmill property and the buildings thereon to the plaintiff to secure all indebtedness of the corporation as the same should mature, not exceeding $5,000 at any one time. The Gilberts claimed that this mortgage was executed after consultation with *Mr. Spafford* and with his consent, but *Spafford* denied this. This mortgage was duly recorded January 25, 1908. The court found that the corporation was insolvent at the time it was executed. January 17, 1908, Mr. and Mrs. Gilbert, acting

as president and secretary of the corporation, gave the plaintiff in the name of the corporation two notes for $1,500 and $2,267.34, respectively, representing the amount that *Peyton* had advanced to the corporation up to that time. These notes included $208.79 for discount, so called, in excess of interest. August 25, 1908, a written agreement was entered into between the plaintiff, Mr. and Mrs. Gilbert, claiming to act for the corporation, and one Caleson, which recited the indebtedness of the *Minong Lumber & Lath Company* to *Mr. Peyton* of $3,767.34 and that the company was unable to pay the same, but that the company had a large quantity of jack pine logs which it was desirous of manufacturing into lumber, but had no capital to pay for manufacturing the same, and that Caleson had offered to manufacture the logs into lumber and lath, provided provision was made for the payment of agreed price for manufacturing, and that therefore the *Minong Lumber & Lath Company* leased to Eli Caleson the mill plant of the property, together with the tools and appliances, until the 31st day of December, 1908, at which time Eli Caleson was to deliver up the premises quietly and peaceably, and that on the 15th day of each month Caleson was to submit to *Peyton* his pay roll for the labor employed in the manufacture, and, if satisfied with the correctness of the pay roll, *Peyton* was to pay the same, and upon the completion of the manufacture *Peyton* was to pay Caleson the balance of compensation, if any, at $4 a thousand for lumber and $1 a thousand for lath. The agreement recited that it was in no way to affect the bill of sale of the logs theretofore given to *Peyton*, but was given in addition to said bill of sale; and, for the purpose of carrying out the agreement, the *Minong Lumber & Lath Company* granted, bargained, sold, transferred, and conveyed to *Peyton* the logs and the lath and lumber that might be manufactured therefrom, and authorized *Peyton* to sell the lumber and lath for such price, at such times, and in such quantities as he deemed best, and

out of the proceeds of the sale to pay, first, all expenses con-
nected with the manufacture and sale of the lumber and lath,
and, second, all indebtedness due and owing him from the
*Minong Lumber & Lath Company,* and the balance, if any,
to be paid over to the *Minong Lumber & Lath Company.*
The lumber was to be insured for the benefit of all the par-
ties as their interest might appear.

The Gilberts testified that *Spafford* knew of and con-
sented to the making of this agreement before its execution,
but *Spafford* testified that he knew nothing about it till after
its execution, and immediately protested against it when in-
formed of it.    The corporation was insolvent when this agree-
ment was made.    Under this agreement Caleson took pos-
session of the logs and the mill early in September, 1908,
and began sawing, and finished the same, except an insig-
nificant amount, some time in December, the date not being
definitely fixed by the evidence.    The plaintiff paid for the
manufacturing done by Caleson $694.80 over and above all
receipts, and also paid for insurance and repairs on the mill
$164.39, making a total net outlay of $859.19 under the
terms of the Caleson contract.    October 27, 1908, the de-
fendant *Spafford* commenced an action against the corpora-
tion for advances of cash made by him, and on December 1,
1908, obtained judgment for $6,065.43 damages and costs.
Execution being issued upon this judgment, the defendant
*Sullivan,* as sheriff of Washburn county, at some time be-
tween December 1st and 9th levied upon the lumber, lath,
and buildings involved in this action.    This action was be-
gun December 23, 1908.    Under stipulation of the parties
the entire property was placed in the hands of the plaintiff
to be sold, the proceeds to take the place of the property itself
and abide the judgment of the court, and nearly all of it has
been sold, and the sum of $1,525.72 realized therefrom.

The court found that the bill of sale, chattel mortgage, and
the so-called Caleson contract were all duly executed by the

authorized agents of the corporation, and were valid; that the
plaintiff took actual possession of the property under the
Caleson contract immediately after its execution, and that
consequently it was valid as a chattel mortgage; that the bill
of sale should be reformed as prayed; and that the plaintiff
was entitled to judgment of foreclosure and sale of the prop-
erty in dispute by virtue of the said securities and to priority
over the execution levy of the defendant *Spafford.* From
judgment in accordance with this finding the defendants ap-
peal.

For the appellants there was a brief by *Grace, Hudnall &
Fridley* and *L. H. Mead,* and oral argument by *Geo. B. Hud-
nall.*

For the respondent there was a brief by *Luse, Powell &
Luse,* and oral argument by *L. K. Luse.*

.Winslow, C. J.    The *Minong Lumber & Lath Company*
had an authorized capital stock of 10,000 shares.    Under
the most favorable view of the evidence only 4,561 of these
shares were ever subscribed for, hence the corporation was
never authorized to transact business with any others than
its members, it could have no meetings, elect no officers, and
its affairs could only be legally directed by the signers of its
articles of incorporation.    However, it became a legal cor-
poration by virtue of the due execution, recording, and filing
of its articles of incorporation, and it afterwards acquired
property, and the questions arising here are simply whether
certain attempted transfers of that property as security for ·
the repayment of moneys advanced to *de facto* officers of the
corporation for corporate uses are valid transfers.

If the question arose between creditors of a *de facto* cor-
poration on the one side and its officers or stockholders upon
the other, there might be some serious difficulties presented,
but it does not so arise.    The contending parties here were
both stockholders in the corporation, and knew all the facts
not only as to the amount of stock issued, but as to the in-

formal way in which the business was carried on.  The evidence shows that J. V. Gilbert, Laura L. Gilbert, *Frank Spafford,* and *H. H. Peyton* were the sole persons beneficially interested as stockholders in this corporation, for the one dollar interest of Mr. Newton, who signed the articles simply as a matter of convenience and has not been heard of since, may properly be treated as negligible.  The four people above named by general consent carried on the business of the corporation during its whole brief and troubled existence in entire disregard of any statutory provisions, and in fact without attempting to observe the most familiar and usual methods of transacting corporate business.  It is true that they used the corporate name; Mr. Gilbert called and signed himself president; *Mr. Spafford* called and signed himself treasurer, and Mrs. Gilbert in the same way rejoiced in the title of secretary.  Letter-heads and bill-heads and checks flourished the imposing corporate name of the concern, but there was little else to indicate that any of the parties had the idea that the corporate name was more than a mere figurehead.  *Mr. Spafford's* testimony shows this to be the case more clearly than that of any of the other parties.  He never apparently treated the corporation idea seriously; he never read through the articles of incorporation; he didn't know he was doing business with Mr. Gilbert for the corporation, or that he was doing it as treasurer; he never attended or heard of a meeting of stockholders or directors; Gilbert said he was going to be president and he (*Spafford*) said nothing about it,—"things were moving pretty fast and we did this by common consent; did a lot of business in an informal way."  It is certainly true that the corporation did, in this informal way, considerable business.  It erected a sawmill, bought logs, manufactured 80,000 feet of lumber, contracted debts aggregating nearly $10,000, and had several thousand dollars worth of logs and material on hand when the Caleson contract was made.

We can reach no conclusion except that all parties con-

sented to the doing of the business in just the way it was done; that it was in fact regarded by all parties rather as a partnership between Gilbert and *Spafford,* with Mrs. Gilbert as a nominal secretary and *Mr. Peyton* as a friendly banker with a slight interest, than as a real corporation.

Were we to pass upon the question as an original one we should have no difficulty in reaching the conclusion that *Mr. Spafford,* by his acts and general conduct, to all intents and purposes consented that business should be done just as it was done, and that Mr. Gilbert should manage the affairs of the business, make loans and give securities upon the corporate property. Apart from this, however, is the testimony of both the Gilberts to the effect that *Spafford* was consulted before the execution of the various securities in litigation here, and consented to them, and the finding of the court to the effect that the three instruments were executed and delivered by the authorized agents of the company. We construe this finding to mean that the Gilberts became such agents by consent of the parties interested,. especially in view of the fact that in the opinion filed by the trial court he places his decision as to the validity of the contracts upon the ground that the corporation transacted its business in the manner in which it did with the knowledge and consent of all its stockholders. In this view of the case we do not reach the numerous and doubtful questions as to the powers of *de facto* officers of corporations, or the validity of transfers of property made by insolvent corporations on the verge of collapse. Where a number of people are jointly interested in the same enterprise they may, by consent, do many things which will be entirely valid and binding as between themselves which would not stand for a moment if the rights of third parties were involved. In this case the only rights involved are the rights of persons who have consented either impliedly or expressly to everything that has been done, and they cannot now be heard to complain.

One further question of some difficulty is presented. The Caleson contract made August 25, 1908, was never filed in the town clerk's office, and hence cannot have effect as a chattel mortgage as against the levy made under the *Spafford* execution, unless actual possession of the property was taken by the plaintiff prior to the levy.

The complaint alleges that possession of the whole property was taken by the plaintiff on or about August 25, 1908, and has ever since been retained. The answer of the defendant *Spafford* alleges "that neither the plaintiff nor Eli Caleson ever had peaceable possession . . . of the mill, logs, or lumber, but that possession was taken and held against the protest of the defendant *Frank Spafford,* and not otherwise." This seems to be an admission that possession was in fact taken and held by the plaintiff; but, as the corporation itself is a party appellant and made answer denying the allegation of possession, it seems necessary to consider the question on the evidence. The court below concluded that Caleson's possession, taken early in September and retained until some time in December when the sheriff made his levy under the *Spafford* execution, was in legal effect the possession of *Peyton.* It seems to us that this conclusion was correct. By the Caleson contract the whole mill property was leased to Caleson until December 31, 1908, and the entire stock of logs and lath on hand was conveyed to *Peyton* as security for the company's indebtedness to him, and Caleson was authorized to manufacture the logs into lumber and lath under the supervision and control of *Peyton,* who was to pay the expenses of manufacture and then pay the indebtedness to himself, after which any balance remaining was to be paid by him to the corporation. As matter of fact there was practically no possibility of there being any surplus to be returned to the corporation. The whole beneficial interest in the logs was vested in *Peyton,* and he was given absolute control over them, Caleson being in actual possession as his agent or bailee

for hire.    The property was not capable of manual delivery, and we think that the delivery of the same to Caleson for the purpose of manufacturing the logs into lumber for the benefit of *Peyton* and under his control must logically be considered as a delivery to *Peyton,* and that Caleson's possession during such manufacture must be considered as *Peyton's* possession.

*By the Court.*—Judgment affirmed.


VINJE, J., took no part.